**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| AUTOMOTIVE MANAGEMENT SERVICES FZ-LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| PAE GOVERNMENT SERVICES, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) ) | |

## COMPLAINT

Plaintiff Automotive Management Services FZ-LLC ("AMS"), by and through its undersigned attorneys, for its complaint against defendant PAE Government Services, Inc. ("PAE"), alleges as follows.

## NATURE OF THE ACTION

1.      This case arises from PAE's repeated and willful breaches of its obligations owed to AMS pursuant to a Subcontract dated September 29, 2017 (as amended from time to time, the "Subcontract").

2.      Under the Subcontract, AMS provided critical support to PAE, as prime contractor, in executing the United States Government's ("USG") Afghanistan National Maintenance Strategy and Ground Vehicle Support ("NMS-GVS") program.

3.      The NMS-GVS program was designed to facilitate the operational independence of the Afghanistan National Army ("ANA") and Afghanistan National Police ("ANP") in managing their respective automotive fleets.

4.      AMS was the backbone of the entire NMS-GVS program.  Indeed, at the beginning of the NMS-GVS program, PAE lacked the necessary personnel and infrastructure in Afghanistan to carry out the program's requirements.

5.      Accordingly, AMS rapidly mobilized more than 3,000 personnel and developed nearly two dozen ANA and ANP vehicle maintenance facilities, carried out automotive repairs at those sites, conducted vehicle maintenance training programs, maintained critical supply chain infrastructure for thousands of pieces of equipment, provided  life support services "outside the wire" of secured military installations, and ran an extensive and effective security program in order to protect against attacks from militant groups in Afghanistan, including the Taliban.

6.      Rather than fairly compensate AMS for the extensive costs that it incurred to administer this complex and resource-intensive project (as PAE agreed to do), PAE has repeatedly abused its position as prime contractor.  PAE has frequently demanded that AMS undertake costly projects, often with little to no instruction, in order to ensure the safety and stability of the NMS-GVS program.  Then, after AMS carries out the relevant work, PAE will refuse to pay AMS for the costs necessary to conduct such work.  PAE's pattern of abusive conduct, set forth in more detail below, has been supported by a never-ending stream of fictitious and non-contractual excuses for refusing to pay AMS's invoices, which has frequently jeopardized AMS's ability to perform its essential functions for the NMS-GVS program, putting both AMS and PAE personnel at risk.

7.      At present, PAE owes AMS more than $16.5 million for AMS's work in connection with the NMS-GVS program.

8.      Accordingly, AMS brings this action to recover those amounts which it is rightfully owed, along with pre-judgment interest, so that it may be made whole despite PAE's repeated breaches of contract.

## PARTIES

9.      AMS is a limited liability company organized and existing under the laws of the United Arab Emirates, with its principal place of business at S-50123 B in the Jafza South Jebel Ali Free Zone, Dubai, United Arab Emirates.  The sole member of AMS is Omni Technical Solutions A/S, which is a Danish *Aktieselskab*, or stock company, with its principal place of business at Gothersgade 1, 2, 1123 København, Denmark.

10.     Upon information and belief, PAE is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business at 1320 North Courthouse Road, Suite 800, Arlington, Virginia 22201.  (*See* Subcontract at 1).

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that this is a civil action between:  (i)  PAE, which is a citizen of the State of Virginia on account of having been incorporated, and having its principal place of business in, Virginia; and (ii) AMS, which is a citizen of two foreign states, Denmark and the United Arab Emirates, because its sole member is a Danish stock company with its principal place of business in the United Arab Emirates.  As set forth above, the amount in controversy is more than $16.5 million, which exceeds 28 U.S.C. § 1332(a)'s minimum requirement that the matter in controversy exceed the sum or value of $75,000, exclusive of interest and costs.

12.     This Court may exercise general personal jurisdiction over PAE pursuant to Fed. R. Civ. P. 4(k) because PAE is subject to the general jurisdiction of the courts of the State of

Virginia on account of it having been incorporated in, and having its principal place of business in, the State of Virginia.  Further, pursuant to Section 8 of the General Terms and Conditions for Services, which was incorporated as Attachment D to the Subcontract, PAE consented to the exclusive jurisdiction of the United States Courts located in the State from which the Subcontract was issued:  in this case, Virginia.

13.     Venue is proper in this division under 28 U.S.C. § 1391(b)(1), in that PAE, the sole defendant, resides in this division.

**FACTUAL BACKGROUND**

I.     **The NMS-GVS Program**

14.     In 2017, the USG awarded a government contract to PAE to assist it in carrying out the NMS-GVS program (the "Prime Contract").  The central goal of the USG's NMS-GVS program was to assist the ANA and ANP in becoming logistically self-reliant in maintaining their respective vehicle fleets, which together comprised more than 100,000 pieces of equipment.

15.     To fulfill this goal, a massive infrastructure needed to be developed.  The original plan contemplated the use of 7 ANA, 11 ANP, and 1 central distribution sites located throughout Afghanistan, at which both vehicle maintenance, as well as training of ANA and ANP personnel, would take place.

| **ANA Sites** | **ANP Sites** |
|---|---|
| Kabul | Kabul |
| Kandahar | Kandahar |
| Maz-e-Sharif | Maz-e-Sharif |
| Helmand | Helmand |
| Gamberi | Gardez |

| Gardez | Herat |
|--------|-------|
| Herat | Wardak |
|  | Zabul |
|  | Jalalabad |
|  | Kunduz |
|  | Uruzgan |
| Central Supply Distribution ||

16.     Each of these sites required a variety of additional support services, including facilities maintenance and management, life support operations, and an extensive security program to protect the facilities themselves, as well as NMS-GVS personnel and property as it was transported throughout the theater.

17.     To support its obligations under the Prime Contract, PAE required the assistance of several potential subcontractors.  One of those subcontractors was AMS which, together with its corporate affiliate, had more than a decade of experience supporting military vehicle maintenance operations in theaters of conflict throughout the world, including in Afghanistan. Indeed, because AMS had an exemplary record of past performance as a subcontractor for other U.S. military operations in Afghanistan, as well as significant infrastructure and property in Afghanistan, PAE relied heavily on AMS when submitting its bid to serve as the prime contractor for the NMS-GVS program.

18.     PAE and AMS engaged in extensive negotiations, lasting more than six months, regarding PAE's potential role as prime contractor and AMS's potential role as a subcontractor before the Subcontract was agreed to.

## II.     AMS Agrees to Provide Services to PAE
## Under the Subcontract in Exchange for Compensation

19.     On or about September 29, 2017, PAE and AMS executed the Subcontract. Under the Subcontract, AMS agreed to provide PAE with labor, contractor logistics support, personnel training and mentoring, personnel security, life support, facilities management and maintenance, and procurement services at the above-referenced ANA and ANP vehicle maintenance sites throughout Afghanistan.  (Subcontract at 1).

20.     AMS's specific obligations under the Subcontract, which represent a significant majority of the NMS-GVS program's overall workshare, are set forth in a Statement of Work which was Attachment A to the Subcontract.  (*See* Subcontract § 2.1).

21.     Section 4 of the Subcontract sets forth the period of performance for the Subcontract.  In general, Section 4 provides that, in the event the USG extends the term of the Prime Contract, then PAE is required to extend the term of the Subcontract with AMS for up to four option years.

22.     As is relevant here, PAE ultimately exercised option years 1, 2, and 3 in favor of AMS through agreed-upon modifications to the Subcontract.  PAE and AMS also agreed to a series of other modifications to the Subcontract.  Relevant to this action are Modification 34, whereby PAE exercised option year 3 to the Subcontract, and Modification 41, which called upon AMS to demobilize NMS-GVS operations in June 2021 in anticipation of the USG's withdrawal from Afghanistan.

23.     In exchange for providing services under the Subcontract, PAE agreed to pay AMS for "its costs of performance to meet its obligations pursuant to the Statement of Work, including agreed upon fees."  (Subcontract § 3.1).

24.     Section 8.6 of the Subcontract sets forth certain requirements for invoicing PAE for the costs AMS incurs performing the Subcontract.  Specifically, Section 8.6 requires that PAE, within ten business days of receipt of an invoice, "either approve the Invoice for payment and confirm approval to [AMS], or reject and return the Invoice to [AMS] specifying the exact reasons for rejection . . . ."  For approved invoices, the Subcontract requires PAE to make payment within forty-five days of the date of invoice submission.  (Subcontract § 8.8).

25.     The Subcontract also contains provisions for addressing situations in which PAE overpays for goods or services provided by AMS.  For example, PAE and AMS agreed that if PAE approved an invoice from AMS, and the USG later determined the invoiced cost was unallowable, PAE and AMS would share that cost on a pro rata basis.  (See Subcontract § 8.9).

26.     The Subcontract imposes two conditions on AMS's obligation to share disallowed costs with PAE.   First, the disputed costs must have been "*determined* to be unallowable" or "*found* . . . not to have been properly payable" by the USG.  (Subcontract Attach. D §§ 2(b)(2), 26(b) (emphasis added)).  Therefore, PAE may only recover from AMS amounts that the USG has formally determined should not have been paid.  Second, PAE is also required to provide AMS with "information regarding any such assessment by the [USG] and the opportunity to materially contribute to any objections made."  (Subcontract § 8.9).  Nothing in the Subcontract permits PAE to withhold payment on approved invoices simply because it anticipates that the USG may later disallow the invoiced costs.

### III.   **AMS Performs all of its Obligations under the Subcontract**

27.     AMS performed all of its obligations under the Subcontract.  At no point during the performance of the Subcontract did PAE identify any materially poor performance (as it was allowed to do pursuant to Section 4.2 of the Subcontract).  To the contrary, PAE repeatedly acknowledged that AMS's performance under the Subcontract was exemplary, even commenting in writing that AMS's staff was "performing magnificently," and with "incredible agility, responsiveness and resilience . . . in the face of adversity and arduous conditions."

28.     For example, the NMS-GVS program set various goals with respect to AMS's training of local ANA and ANP mechanics, with the general purpose of increasing the ANA's and ANP's local capabilities to service their own fleets.  In PAE's own reports to the USG, PAE commented that AMS's training efforts were wildly successful, regularly outpacing the required metrics for training ANA and ANP mechanics.

29.     As another example, the Subcontract required AMS to provide extensive security services at the NMS-GVS sites.  Each of those sites was subject to the ever-present threat of an attack by the Taliban and, throughout the life of the Subcontract, deteriorating security conditions throughout Afghanistan at large.  Nevertheless, there were zero fatalities at any NMS-GVS site throughout the life of the program—a testament to the security program implemented by AMS.

### IV.   **PAE Improperly Refuses to Compensate**
####       **AMS for Costs Incurred During the Subcontract**

30.     In August 2021, the Taliban took over Afghanistan's capital in Kabul, and the NMS-GVS program came to an effective halt.  Since that time, AMS has worked to constructively close out all outstanding items with respect to the Subcontract.

31.     Despite AMS's faithful service to the NMS-GVS program throughout the life of the Subcontract, PAE has invented a series of baseless justifications for withholding amounts properly due and owing, in express breach of the Subcontract and related agreements made between the parties.

32.     To date, PAE owes AMS more than $16.5 million in expenses incurred by AMS in performance of the Subcontract, as outlined below:

| Expense Category | Amount (USD) |
| --- | --- |
| Approved invoices not yet paid | 5,331,702.97 |
| Salaries paid to international training staff hired at the direction of PAE | 801,757.71 |
| Parts and transportation costs | 1,388,892.93 |
| "Top up" payments to security personnel | 1,546,081.84 |
| AMS property lost to the Afghan government during demobilization | 6,088,867.00 |
| Costs reimbursable to AMS by realigning program funding | 1,420,125.45 |
| | **16,577,427.90** |

Each of the above-listed costs, and PAE's obligation to compensate AMS for the same, is described in further detail below.[1]

---

[1]     While AMS is currently owed more than $16.5 million, AMS reserves its right to amend this complaint should PAE decline to pay certain additional costs that AMS anticipates invoicing PAE for in due course.  Such costs will include an incentive fee (which AMS estimates will be worth approximately $2.2 million), reimbursement to account for PAE's underpayment of AMS's G&A expenses at government approved rates (which AMS estimates will be worth approximately $1.8 million), accrued leave time for AMS's employees (which AMS estimates will be worth approximately $317,000), and other incurred costs that AMS intends to invoice PAE for shortly (which AMS estimates will be worth approximately $441,000).

**A.    PAE improperly withholds payment of approved invoices based on the possibility that unrelated costs will be disallowed in the future.**

33.    As of the filing of this Complaint, AMS has submitted approximately $8.1 million in invoices to PAE for a variety of costs incurred, each of which PAE approved.  Of the total amount invoiced, $5,331,702.97 is now past due.

34.    On or about December 23, 2021, PAE shared with AMS a redacted copy of an audit report issued by the Special Inspector General for Afghanistan Reconstruction ("SIGAR") (the "Audit Report").  According to PAE, the Audit Report indicated that $4,534,069.71 of costs charged by AMS (and, in turn, apparently submitted by PAE to the USG) may be subject to challenge.

35.    PAE also indicated that it intends to withhold $2,936,767.56 in amounts owed to AMS, based on the possibility that AMS and the United States Defense Contract Audit Agency ("DCAA") may agree to decrease the rates at which general and administrative ("G&A") expenses for calendar years 2019 and 2020 were billed to the Subcontract.  However, as of today there is no final agreement between the DCAA and AMS regarding the appropriate G&A rates for calendar years 2019 and 2020.

36.    As a result, PAE has preemptively decided to hold back $7,470,837.27 in payments that are already owed to AMS or will come due under invoices that PAE had previously approved.

37.    PAE's decision to withhold payment on these bases is entirely unfounded. Nothing in the Subcontract allows PAE to unilaterally withhold payments based on the Audit Report, or an anticipated agreement with the DCAA, notwithstanding that PAE has already approved the relevant invoices.  Rather, PAE is only allowed to make reductions to amounts

owed to AMS if certain costs are "***determined to be unallowable***" or have been "***found*** . . . not to have been properly payable" (Subcontract Attach. D §§ 2(b)(2), 26(b) (emphasis added)).

38.     There has been no determination nor finding that any of the costs submitted by AMS, to the extent they are referenced in the Audit Report, are unallowable or not properly payable.  PAE's withholding on the basis of the Audit Report is impermissible under the Subcontract and is in blatant breach of these Subcontract provisions.  To date, PAE's breach has caused AMS damages in the amount of $5,331,702.97.

> **B.     *PAE baselessly refuses to pay for T&M expenses that it expressly requested be incurred because PAE failed to provide a code to which such costs could be billed.***

39.     PAE has also refused to pay AMS for the cost of certain trainers' salaries that PAE expressly instructed AMS to hire.

40.     On or about September 24, 2020, AMS and PAE executed Modification 34 to the Subcontract ("Modification 34"), whereby PAE exercised option year 3 to the Subcontract. Modification 34 added Section 3.1.17 to the Subcontract, which directed AMS to "support the establishment of component repair [Training & Mentoring]" at four regional sites in Herat, Kabul, Kandahar, and Mazar, Afghanistan, respectively.  PAE also issued a Program Manager Directive requiring that four "OCNs"—Other Country Nationals, or international employees— were to "provide T&M in Shop Foreman, Parts Department, Operations and Administration" (the "ACOP Trainers").  (*See* PMD008 § 3.2.6).  And PAE's Basic Operating Expenses spreadsheet for option year 3 (the "OY3 BOE") similarly called for the hiring of "ACOP Training & Mentoring" employees at the regional facilities.

41.     AMS hired the international ACOP Trainers as instructed by PAE.  However, PAE did not provide a billing code to establish the salary level for these employees.  In order to compensate the ACOP Trainers and seek reimbursement from PAE, AMS had to pay and bill the

ACOP Trainers' salaries using a code already existing in PAE's invoicing system.  AMS selected the "Maintenance Trainer/Mentor" billing code, and subsequently provided PAE with market research to support the reasonableness of the salaries paid to individuals that performed in these roles.

42.     On or about August 12, 2021, AMS sent PAE invoices for the ACOP Trainers' salaries for the period January through April 2021 in the amount of $527,760.69 and for the period May through June 2021 in the amount of $273,991.02, totaling $801,757.71.

43.     On or about December 22, 2021, PAE emailed AMS rejecting the invoices. PAE offered no substantive basis for its refusal to pay the invoices, instead requesting a series of changes to the format and content of a market research summary that AMS provided to support the reasonableness of the relevant salaries.  PAE also stated, arbitrarily and without any basis, that the "most relevant source" of salary data provided by AMS was "outdated" and that AMS needed to include additional comparative salary data, even though there was no such requirement in the Subcontract.

### C.     PAE refuses to pay invoices for certain parts and transportation costs on the ground that it lacks supporting documents, despite having been provided all such documents more than two years ago.

44.     PAE has also baselessly refused to pay AMS for more than $1.3 million in parts and transportation costs, which AMS incurred years ago.

45.     PAE has attempted to excuse its refusal to pay for these costs by citing anonymous allegations, made in May 2018, that AMS's then-head of security, Najeeb Shamal, was affiliated with certain vendors (the "Conflicted Vendors") and had caused AMS to procure spare parts and transportation services from the Conflicted Vendors at inflated prices.

46.     However, after the allegations concerning the Conflicted Vendors were made, AMS terminated Mr. Shamal and reviewed all procurements awarded to the Conflicted Vendors

in connection with the Subcontract.  While AMS determined that in some instances, the Conflicted Vendors may have been granted awards at above-market prices, AMS has agreed to provide PAE with credit so as to ensure that PAE was not overcharged.  AMS also provided to PAE all documents supporting its calculation of the true market rate of the procurements.

47.    After accounting for the credit AMS has agreed to provide to PAE, PAE still owes AMS $1,388,892.93 for goods and services rendered by the Conflicted Vendors, which AMS has already paid and for which AMS is entitled to reimbursement.

48.    PAE, however, refuses to pay for any goods or services delivered by any of the Conflicted Vendors.  PAE acknowledges that AMS has submitted significant volumes of documentation supporting the costs associated with more than 5,000 items procured, along with a spreadsheet identifying the specific documents, by page number, relied upon to support each individual procurement.  Nevertheless, PAE refuses to approve these costs for reimbursement on the baseless ground that these documents are not "organized in a sufficient manner," while complaining that PAE should not be required to "decipher" such voluminous documents.  Of course, it is PAE that has demanded such a significant volume of supporting documentation in the first instance.  And to date, PAE failed to identify a single, particular deficiency in the documents provided by AMS, or any explanation as to why their "organization" is insufficient. It appears that PAE's constantly moving target is little more than an effort to further delay payment to AMS that which AMS is owed.

### D.    PAE refuses to pay security personnel 'top-up' payments.

49.    PAE has also refused to pay for millions of dollars of expenses that were necessary to ensure the security of the NMS-GVS program, which PAE previously agreed to pay.

50.     Specifically, Section 3.3 of the Subcontract's Statement of Work required to AMS to provide security "in accordance to its existing security model."  Under its then-existing security model, AMS contracted with Afghanistan's National Public Protection Force, or "NPPF," who provided personnel to assist with the NMS-GVS program's security needs.  Like other Afghanistan government-backed service providers, the NPPF was not independently operated and paid below-market wages to its employees, often months late at a time. Accordingly, as is customary in Afghanistan, AMS provided those NPPF employees that worked for AMS with a monthly "top-up" payment, which made each NPPF employee's aggregate wages commensurate with market rates, and also guaranteed that these critical security employees would receive at least a portion of their wages consistently.

51.     PAE was aware of AMS's practice of paying NPPF employees top-up payments from the beginning of the Subcontract's performance.

52.     PAE also recognized the value that paying the top-up payments provided to the security of the NMS-GVS program.  As just one example, in the summer of 2020, PAE began to question whether it would reimburse AMS for the top-up payments.  AMS, in turn, was forced to cease making the top-up payments and, predictably, NPPF protests ensued.

53.     PAE requested that AMS reinstate the top-up payments due to the heightened security threats, disruption to security, and security strikes that resulted from these protests.

54.     PAE acknowledged as much in writing, when it stated that it had "significant communications regarding 'Top-Up Payments' . . . and *__informed AMS to move forward__* with OY3 'Top-Up Payments' and provide appropriate supporting documentation."  (Emphasis added).  PAE also acknowledged that its own program manager had "mediate[d] the situation with the NPPF guards," and, presumably, promised the guards that they would be paid.

14

55.    On June 7, 2021, AMS submitted three invoices representing the amounts paid to the NPPF to "top up" their salaries for the base year and option years 1 and 2.  The total amount invoiced was $1,206,341.07.

56.    PAE, despite having agreed to the necessity of these costs, rejected the invoices "pending the determination of cost allowability by the contracting officer."

57.    Nothing in the Subcontract permits PAE to reject invoices pending the review and assessment of the cost's allowability by the contracting officer.  To the contrary, as noted above, to the extent any cost is eventually deemed unallowable, the Subcontract provides for a variety of mechanisms to address such a finding.  There was no such finding here and, in turn, these critical security costs should have been paid.

58.    Then, on July 31, 2021, AMS submitted two additional invoices for top up payments made to NPPF personnel during option year 3 and the ensuing de-mobilization of the Subcontract.  These invoices were for $277,332.60 and $62,408.17, respectively.

59.    Nevertheless, PAE rejected these invoices on October 12, 2021, well after the purported window to reject an invoice had closed, arguing that certain "[r]equirements . . . have not been addressed yet."  There was never any contractual basis for these purported "requirements," as PAE simply invented them after the fact.  To date, AMS remains uncompensated for the $1,546,081.84 in costs it incurred funding these important security initiatives.

**E.     PAE fails to compensate AMS for property lost to the Afghan government, despite its prior agreement that AMS could submit a claim for those losses.**

60.    PAE has also refused to compensate AMS for millions of dollars of losses of AMS's contractor-owned property ("COP") that was directly caused by PAE's failures as prime contractor.

61.     Specifically, AMS permitted the NMS-GVS program to use AMS's contractor owned-property ("COP"), which was already in Afghanistan prior to the execution of the Subcontract, at no cost to PAE.   For example, AMS- owned the workshops, storage, life support facilities, offices, security infrastructure, tools, equipment, and vehicles that were necessary to carry out NMS-GVS operations throughout Afghanistan.  Figure 1 shows the extent to which AMS's COP served as the backbone to the Contract's operations at one of AMS's former facilities in Afghanistan.  AMS's other facilities utilized a similar quantity of AMS COP.



***Figure 1.***  *AMS contractor-owned property ("COP") at a former NMS-GVS*
*facility in Afghanistan.  AMS COP is highlighted in red.*

62.     On or about April 30, 2021, PAE issued its first and only unilateral modification to the Subcontract ("Modification 41") to AMS.  Modification 41 purported to require AMS to demobilize contract operations no later than June 28, 2021 as part of the United States Army's anticipated withdrawal from Afghanistan.

63.     An accompanying plan for demobilizing Contract operations, called CDRL A025 Contractor Demobilization Plan (the "Demobilization Plan"), provided that AMS had to redeploy its COP to an AMS facility in Kabul, known as the Central Maintenance Facility ("CMF"), so that the COP could be returned to AMS.  According to the Demobilization Plan, "[a]ny

remaining COP identified will be transitioned over to the USG or ANDSF as found on installation or through invoice processing, thus relinquishing ownership and rendering it [USG] or ANDSF Property."  (Demobilization Plan § 5.18).

64.     The same day that AMS received and reviewed Modification 41, AMS raised concerns to PAE regarding the tight, fifty-eight day period during which the Demobilization Plan was supposed to be executed, deficiencies in the Demobilization Plan, and PAE's lack of transparency with regard to its conversations with the USG about the same.  Indeed, prior versions of the Subcontract had contemplated that demobilization would take at least 120 days. AMS requested further information from PAE and invoked its right to potential equitable adjustments that might be required as a result of the Modification.

65.     On or about May 11, 2021, AMS submitted to PAE a proposed update to the Demobilization Plan.  The proposed update sought to address key gaps in direction in the Demobilization Plan concerning how to demobilize the NMS-GVS program under such an accelerated timeframe, and specifically identified risks attendant to removing COP from the country.   Those included, among others, the ANDSF's "expected refusal of removal and decommissioning" of COP, "potentially creating high risk flash points resulting in harm or incarceration of personnel" and the "[d]eteriorating security of main travel routes," which would "place transportation of COP at risk of loss, theft, and destruction."  AMS recommended the use of a private security company to mitigate this heightened security risk through the end of the demobilization period.  PAE rejected this recommendation, but, tellingly, extricated its own personnel from the theater a week prior to the end of the demobilization effort.

66.     On or about May 13, 2021, PAE and AMS held a meeting during which they discussed how to handle the removal of AMS's COP (the "May 13 Meeting").  AMS emphasized

to PAE the conflicting nature of the instructions in the Demobilization Plan concerning the removal of COP, because the Demobilization Plan required the removal of COP that would still be in use during the demobilization period.  For example, AMS had to continue to service ANDSF vehicles during the first twenty days of demobilization, preventing AMS from removing and transferring the COP needed to support that effort.  In effect, it was impossible for AMS to demobilize Subcontract operations and simultaneously remove its COP from the theater.

67.    A potential solution discussed at the May 13 Meeting was for the USG to purchase the COP from AMS.  Accordingly, PAE agreed that it would engage the USG for discussion concerning whether the USG wished to purchase the COP and, if not, to obtain guidance from the USG as to how AMS should remove the COP from the theater.  PAE further agreed that if the USG did not intend to purchase the COP, PAE would add provisions to the Demobilization Plan addressing removal of the COP.  PAE assured AMS that, in a worst-case scenario in which AMS could not successfully remove its COP from the theater or reach agreement with the USG, that AMS could submit a claim for reimbursement from PAE.

68.    On or about May 24, 2021, AMS issued a COP sales proposal for consideration by the USG (the "Sales Proposal").  Pursuant to the Sales Proposal, AMS offered to sell all COP to the USG at the COP's acquisition cost of $6,088,867.00, which was less than its estimated replacement cost of approximately $6.3 million.  The USG rejected the Sales Proposal and instead offered to pay AMS just $360,000.00 for certain tools and equipment.  AMS rejected this counteroffer, which would have neither solved the challenges associated with removing the COP from the theater nor provided AMS anything even approaching fair value for the property.

69.    On or about June 8, 2021—just twenty days before the deadline to complete the demobilization effort—PAE provided AMS with an updated Modification 41 to the Subcontract

that stated that the Demobilization Plan would be "revised to include . . . COP provisions subject to formal guidance received from USG."  However, PAE never provided AMS with the requested guidance, nor did PAE revise the Demobilization Plan to account for removal of the COP as provided in the update, and as it had agreed at the May 13 Meeting.

70.     The potential problems about which AMS had repeatedly warned PAE concerning the removal of the COP came to pass.  On or about June 24, 2021, the Afghan Ministry of the Interior ("MOI") deployed the NPPF to seize control of the CMF.  NPPF officers refused to allow AMS to remove its COP from the CMF, and an NPPF general even attempted to extort armored vehicles (which, in fact, had already been signed over to the MOI) from AMS in exchange for permission to leave the premises.[2]

71.     Subsequent attempts by AMS to retrieve the COP were unsuccessful.  AMS was forced to leave the COP at the CMF and other sites throughout Afghanistan.

72.     On or about July 3, 2021, PAE sent AMS a letter in response to AMS's June 24, 2021 letter of concern regarding the impossibility of removing AMS's COP from the theater as provided in the Demobilization Plan.  In this letter, PAE "reject[ed] any liability or responsibility for any 'damages' AMS believe[d] it suffered as a result of the U.S. government-directed demobilization of the [NMS-GVS] program."

73.     PAE's express breach of its agreement to permit AMS to submit a claim for reimbursement for the COP has resulted in a loss to AMS of $6,088,867.00.

---

[2]      It is possible that the landlord from whom AMS leased the land which was used for the CMF may assert a claim against AMS based on AMS's failure to remove all of its COP.  AMS reserves its right to assert claims against PAE for any costs AMS may incur responding to such a claim, should it be raised in the future.

**F.      PAE refuses to realign allocated and unused funding to tasks that PAE itself requested that AMS undertake.**

74.      Upon information and belief, PAE has significant flexibility when it comes to allocating costs against the various budget ceilings set for its own performance under the contract.  AMS has observed, in publicly-reported information, that PAE has re-allocated costs among varying budget categories, implying that as long as PAE's overall costs incurred with respect to the NMS-GVS program fall within the budgeted-for amounts, PAE will be entitled to compensation from the USG for its performance.

75.      Indeed, PAE has regularly communicated that to the extent AMS's performance under the Subcontract was about to reach any of a variety of budget caps, available and unused funding from other portions of the program could be reallocated to ensure that AMS's costs would be reimbursed.  As just one example, during the May 13 Meeting, PAE agreed that it would realign certain funds to address cost overruns for option year 2 invoices, which amount to $603,389.36.[3]  PAE has separately committed to seeking approval from the NMS-GVS Contract's contracting officer for the reallocation of these funds.

76.      Now, in breach of its agreements, as well as the duty of good faith and fair dealing that is implicit in the Subcontract, PAE has refused to pay AMS for a total of $1,420,125.45 in costs, many of which were incurred to cover essential life support costs, that have been incurred on PAE's behalf.[4]  The sole basis of PAE's refusal is that those costs fall

---

[3]      Total option year 2 cost overruns are $1,039,819.80.  The option year 2 cost overruns include $436,430.44 attributable to the NPPF top-up payments.  AMS asserts a separate claim for reimbursement of the top-up payments (*see supra* ¶¶ 39–43; *infra* ¶¶ 83–86) and, accordingly, has reduced the damages amount sought for PAE's breach of its agreement to realign funding for option year 2 cost overruns to $603,389.36.

[4]      Total cost overruns under the Subcontract are $2,381,674.86.  The cost overruns include $961,549.41 attributable to the NPPF top-up payments.  AMS asserts a separate claim for reimbursement of the top-up payments (*see supra* ¶¶ 39–43; *infra* ¶¶ 83–86) and, accordingly, has reduced the damages amount sought for PAE's bad-faith refusal to realign funding for cost overruns to $1,420,125.45.  The $1,420,125.45 in cost overruns owed to AMS includes the $603,389.36 in overruns attributable solely to option year 2 (*see supra* ¶ 62), and the total damages amount sought by AMS in this Complaint has been calculated accordingly.

within categories whose budget has been exceeded.  PAE refuses to pay these amounts even though, in total, AMS's expenses incurred under the Subcontract were more than $41 million under budget.

77.     The result is that PAE has been unjustly enriched:  AMS has incurred a variety of expenses, all at the direction of PAE in order to support the Subcontract, and PAE has purposely attempted to capture the value of AMS's work without providing AMS compensation.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – Improper Refusal to Pay Approved Invoices)

78.      AMS repeats and realleges paragraphs 1 through 77 hereof, as if fully set forth herein.

79.     AMS and PAE entered into the Subcontract, which requires PAE to pay AMS certain amounts as provided for by the Subcontract.

80.     PAE has breached the Subcontract by refusing to pay invoices in the amount of $5,331,702.97 on the ground that these costs may eventually be deemed disallowable based on the results of the Audit Report.

81.     The possibility that some of AMS's costs may later be deemed unallowable is not a basis for withholding payment of approved invoices under the Subcontract.

82.     PAE's refusals to pay the amounts owed to AMS has damaged AMS by depriving it of the $5,331,702.97 that rightfully belongs to AMS.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Refusal to Pay ACOP T&M Costs)

83.     AMS repeats and realleges paragraphs 1 through 82 hereof, as if fully set forth herein.

84.     AMS and PAE entered into the Subcontract, which requires PAE to pay AMS certain amounts as provided for by the Subcontract.

85.     PAE has breached the Subcontract by refusing to pay invoices in the amount of $801,757.71 for ACOP Trainer salary expenses that PAE required AMS to incur pursuant to a modification to the Subcontract.

86.     PAE's refusals to pay the amounts owed to AMS has damaged AMS by depriving it of $801,757.71 that rightfully belongs to AMS.

### THIRD CLAIM FOR RELIEF

**(Breach of Contract – Refusal to Pay Parts & Transportation Costs)**

87.     AMS repeats and realleges paragraphs 1 through 86 hereof, as if fully set forth herein.

88.     AMS and PAE entered into the Subcontract, which requires PAE to pay AMS certain amounts as provided for by the Subcontract.

89.     AMS performed all of its obligations under the Subcontract, including submitting to PAE "all applicable supporting documents" as defined in Section 8.3 of the Subcontract, with respect to $1,388,892.93 in invoices that it submitted to PAE for certain parts and transportation costs.

90.     PAE has breached the Subcontract by refusing to pay the invoices, despite AMS having provided all required documentation to PAE.

91.     PAE's refusal to pay these invoices has damaged AMS by depriving it of $1,388,892.93 that rightfully belongs to AMS.

## FOURTH CLAIM FOR RELIEF

**(Breach of Implied Covenant of Good Faith and Fair Dealing –
Refusal to Pay Parts & Transportation Costs)**

92.     AMS repeats and realleges paragraphs 1 through 91 hereof, as if fully set forth

herein.

93.     AMS and PAE entered into the Subcontract, which requires PAE to pay AMS

certain amounts as provided for by the Subcontract.

94.     AMS performed all of its obligations under the Subcontract, including submitting

to PAE "all applicable supporting documents" as defined in Section 8.3 of the Subcontract, with

respect to $1,388,892.93 in invoices that it submitted to PAE for certain parts and transportation

costs.

95.     The parties agreed, and it was AMS's expectation, that if AMS incurred a cost in

connection with its performance of the Subcontract and provided supporting documentation as

required by Section 8.3, PAE would reimburse AMS for the invoiced cost.

96.     PAE has arbitrarily, and in bad faith, instead imposed a never-ending stream of

new documentation requirements, and other preconditions, as a baseless excuse for denying

AMS compensation that AMS is rightfully owed.

97.     PAE has breached its duty to perform in good faith by refusing to pay the

$1,388,892.93 in invoices owed to AMS.

98.     PAE's refusal to pay these invoices has damaged AMS by depriving it of

$1,388,892.93 that rightfully belongs to AMS.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract – Failure to Pay 'Top Up' Costs)

99.     AMS repeats and realleges paragraphs 1 through 98 hereof, as if fully set forth herein.

100.     AMS and PAE entered into the Subcontract, which requires PAE to pay AMS certain amounts as provided for by the Subcontract.

101.     PAE agreed to reimburse AMS for a certain percentage of "top up" payments made to NPPF personnel as part of AMS's performance of the Subcontract.

102.     PAE breached the Subcontract by refusing to pay $1,546,081.84 in invoices for top up payments "pending the determination of cost allowability by the contracting officer," which is not a basis for withholding payment under the Subcontract.

103.      PAE's refusal to pay these invoices has damaged AMS by depriving it of $1,546,081.84 that rightfully belongs to AMS.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract – Refusal to Compensate AMS for Lost COP)

104.     AMS repeats and realleges paragraphs 1 through 103 hereof, as if fully set forth herein.

105.     At the May 13 Meeting, PAE agreed to obtain guidance from the USG concerning the removal of AMS's COP from the theater if the USG did not purchase the COP and, if removal of the COP was unsuccessful, to allow AMS to submit a claim for any lost COP.

106.     The USG did not purchase the COP and PAE failed to obtain the requisite guidance from the USG concerning the COP's removal from the theater.  As a result, AMS's COP was lost and became the property of the Afghan government.

107.    PAE has breached the agreement made with AMS at the May 13 Meeting by refusing to allow AMS to submit a claim for reimbursement for its lost COP, which was worth $6,088,867.00.

108.    PAE's refusal to permit AMS to submit the claim has damaged AMS by depriving it of $6,088,867.00 that rightfully belongs to AMS.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract – Failure to Realign Funding)

109.    AMS repeats and realleges paragraphs 1 through 108 hereof, as if fully set forth herein.

110.    AMS and PAE are parties to the Subcontract.

111.    At the May 13 Meeting, PAE agreed to realign certain funds to address purported option year 2 cost overruns so that AMS could be compensated for those costs, despite any provision in the Subcontract to the contrary.

112.    PAE has breached the agreement made with AMS at the May 13 Meeting by refusing to realign $603,389.36 in funding necessary to compensate AMS for the option year 2 cost overruns.

113.    PAE's refusal to realign the funds has damaged AMS by depriving it of $603,389.36 that rightfully belongs to AMS.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment – Failure to Realign Funding)

114.    AMS repeats and realleges paragraphs 1 through 113 hereof, as if fully set forth herein.

115.    PAE has repeatedly assured AMS that if AMS's performance under the Subcontract exceeded the budget cap for a given portion of the program, PAE would realign unused funding from other portions of the program to reimburse AMS and/or seek authorization from the NMS-GVS contracting officer to do the same.

116.    These assurances by PAE created a reasonable expectation on the part of AMS that despite any provision in the Subcontract to the contrary, AMS could perform under the Subcontract in excess of the budget cap for a given portion of the program and still seek reimbursement from PAE.

117.    PAE should have reasonably expected, despite any provision in the Subcontract to the contrary, that AMS would continue to perform under the Subcontract for portions of the program for which the budget cap had been exceeded when PAE instructed AMS to continue so performing.

118.    PAE has been unjustly enriched through AMS's performance of the Subcontract in excess of certain budget caps and PAE's refusal to reimburse AMS for that performance, in the amount of $1,420,125.45, from available excess funding.

**PRAYER FOR RELIEF**

WHEREFORE, AMS respectfully requests that the Court enter judgment in its favor as follows:

A.    Awarding AMS damages in an amount to be determined at trial, but in no event less than $16,577,427.90, plus statutory pre-judgment interest and costs.

B.    Awarding AMS attorneys' fees and costs, including attorneys' fees and costs incurred in this action.

C.    Granting AMS such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 and Local Civil Rule 38, AMS hereby demands a trial by

jury on all issues so triable.

Dated: February 22, 2022
Arlington, Virginia

Respectfully submitted,

CORDATIS LLP

By: s/ Joshua Schnell

Joshua Schnell (Va. Bar No. 78165)
1011 Arlington Boulevard, Suite 375
Arlington, VA 22209
Telephone: 202-342-2550
Fax: 202-342-6147
Email:  JSchnell@cordatislaw.com

HERBERT SMITH FREEHILLS NEW YORK LLP
Scott S. Balber (*pro hac vice admission pending*)
Michael P. Jones (*pro hac vice admission pending*)
450 Lexington Avenue
New York, NY 10017
Telephone: 917-542-7600
Fax: 917-542-7601
Email: Scott.Balber@hsf.com
        Michael.Jones@hsf.com

*Attorneys for Plaintiff*
*Automotive Management Services FZ-LLC*